## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 1:24-CR-00080 |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| NOEL MATEO and | : | |
| DAVID DUCLOS | : | Judge Jennifer P. Wilson |

### <u>MEMORANDUM</u>

Presently submitted for the court's consideration is a motion to suppress evidence by Defendants, Noel Mateo ("Mateo") and David Duclos ("Duclos"). Defendants contend their Fourth Amendment rights were violated during a traffic stop of the commercial motor vehicle they were driving. The task before the court is two-fold. First, the court must determine whether law enforcement prolonged the traffic stop without reasonable suspicion in contravention of *Rodriguez v. United States*, 575 U.S. 348 (2015), and its progeny. If law enforcement had reasonable suspicion to prolong the stop, then the court must determine if the stop's circumstances constituted a *de facto* arrest without probable cause. For the reasons that follow, the court will deny Defendants' motion.

### FINDINGS OF FACT

On December 7, 2023, Pennsylvania State Police Trooper First Class David Long ("Trooper Long") was positioned in an unmarked police cruiser on the Pennsylvania Turnpike in Franklin County observing eastbound traffic. (Hr'g Tr.

1

24:6–9.)[1]  Trooper Long is a member of the Pennsylvania State Police's "Safe Highway Initiative through Effective Law Enforcement Detection" Unit ("SHIELD Unit").  According to Trooper Long, the "pure purpose" of his work on the SHIELD Unit "is to conduct interdiction highway stops" so as to detect serious criminal activity involving, *inter alia*, "human trafficking . . . narcotics, guns, money, fraud, [and] ID theft."  (Hr'g Tr. 10:6–15.)

Trooper Long's work has primarily focused on commercial motor vehicles since about December 2022.  Leading up to then, Trooper Long completed several training programs on the commercial motor vehicle industry.  (Hr'g Tr. 11:9–20.)  These included both private trainings and the federal Drug Interdiction Assistance Program ("DIAP").  (*Id.*)  DIAP teaches the basic components of the commercial motor vehicle industry and how one can separate "normal industry behavior" from "possible criminal activity."  (Hr'g Tr. 11:19–20.)  In December 2022, Trooper Long became certified to conduct North American Standard Level III inspections ("Level III Inspection") of commercial motor vehicles after he completed the required 40-hour course, the course exam, and 32 mentored inspections.  (Hr'g Tr. 10:23–11:1, 14:1–10.)

---

[1] Citations to "Hr'g Tr." refer to the transcript of the evidentiary hearing convened on April 11, 2025.  (Doc. 57.)

Level III Inspections are document inspections designed to determine if drivers can safely drive.  (Hr'g Tr. 13:6–12, 71:16–19.)  The inspection procedure is nationally uniform, Hr'g Tr. 15:15–16, and involves 13 steps, which need only be briefly summarized here.  (Gov. Ex. 3.)[2]  First, an inspector determines the inspection site, approaches the driver, and asks for basic information concerning the trip, such as the starting location and final destination, a load description, time traveled, and recent stops.  (*Id.*)  The inspector then collects the documents for inspection, including, for example, commercial driver's licenses, driver medical certificates, driver logbooks, periodic inspection certificates, bills of lading, shipping papers, and other receipts.  (*Id.*)  The inspector uses several databases to confirm that there are no issues with the licenses, medical certificates, or logbooks. (*Id.*)  These databases included CLEAN, NCIC, and the FMCSA portal (Department of Transportation information), CIDLIS (medical information), and eRODs (driver logbooks).  (Hr'g Tr. 47:18–48:4.)  Once these document verifications are complete, so is the inspection.  (Gov. Ex. 3.)  Trooper Long follows this procedure as closely as possible whenever he conducts Level III Inspections, which he had conducted on 161 occasions prior to December 2023. (Hr'g Tr. 16:18–20; Gov. Ex. 7.)

---

[2] Citations to "Gov. Ex." refer to the Government's exhibits that were admitted at the April 11 evidentiary hearing.  (Doc. 48-1.)

At approximately 2:30 p.m. on December 7, Trooper Long observed a commercial flat-bed truck with heavily tinted windows. Trooper Long decided at once to pull the truck over for a suspected window-tint violation and to conduct a Level III Inspection. (*See* Hr'g Tr. 113:19–25.) This decision comported with his general practice of performing a Level III Inspection every time he stops a commercial truck. (Hr'g Tr. 113:15–18.) Trooper Long was accompanied by Trooper Hope, another Pennsylvania State Police trooper. Trooper Hope was riding with Trooper Long to "get on-the-job training with commercial vehicles." (Hr'g Tr. 24:16–19.)

Trooper Long and Trooper Hope approached the truck at approximately 2:32 p.m. (MVR 14:32:00–05.)[3] Mateo and Duclos were both seated in the front seats of the cab—Mateo occupying the driver's seat and Duclos the passenger's seat. (Hr'g Tr. 29:21–22, 30:24–31:1, 31:20–22.) At Trooper Long's request, Duclos moved near the back of the cab to give Trooper Long space to step up onto the truck. (Hr'g Tr. 29:22–23.) Trooper Long first asked about and tested the truck's window tint, which turned out to be significantly under compliant. (Hr'g Tr. 33:13–16.) Mateo answered Trooper Long's questions about the window-tint violation. (MVR 14:32:25–33.)

---

[3] Citations to "MVR" refer to the recording from the mobile video recording system that was mounted to Trooper Long's police cruiser. That video was admitted as Government Exhibit A at the April 11 evidentiary hearing.

During this initial encounter, Trooper Long collected the documentation necessary for a Level III Inspection, which included both paperwork and Defendants' electronic logbooks, and questioned the pair. Defendants' paperwork was "professional" and well organized. (Hr'g Tr. 38:11–12.) In fact, "less than 5%" of inspections that Trooper Long had conducted involved such organized paperwork. (Hr'g Tr. 38:16–17.) Trooper Long's questions concerned where the pair started, their ultimate destination, the truck's inspection record, and the cargo being transported. (MVR 14:32:48–33:37.) Mateo courteously answered these preliminary questions while exhibiting heavy breathing and staring straight ahead between answers. (Hr'g Tr. 35:19–21; 37:10–20.) Mateo also kept looking back at Duclos while answering Trooper Long's questions. (Hr'g Tr. 36:2–3.) This made Trooper Long think that Mateo was a new driver and prompted him to ask if Mateo was a trainee or new to trucking. (Hr'g Tr. 36:3–6.) At that point, Defendants clarified that Duclos owned the truck. (MVR 14:33:57–34:03.) Duclos then began answering Trooper Long's questions.

Trooper Long eventually learned that the pair were hauling about 8,000 pounds of aluminum from outside Tulsa, Oklahoma to Long Island, New York. (MVR 14:35:52–36:07; Hr'g Tr. 41:24–25.). Trooper Long expressed surprise that they were coming from Oklahoma, given the fact they were traveling the Pennsylvania Turnpike. (Hr'g Tr. 41:11–14.) He normally sees trucks traveling

from Oklahoma on Interstate 81.  (Hr'g Tr. 15–16.)  Defendants explained they traveled the Pennsylvania Turnpike to avoid Interstate 81's mountainous terrain. (Hr'g Tr. 41:18–20.)  Trooper Long also learned that Mateo and Duclos had been a team on and off for the previous two months.  (Hr'g Tr. 44:14–16.)

Following his initial questioning, Trooper Long dismounted the truck at around 2:38 p.m. and said to Trooper Hope, "that's not normal."  (Hr'g Tr. 45:15–17.)  Within less than a minute of hearing this, Trooper Hope walked around the entire perimeter of the truck looking underneath the flat bed in an apparent attempt to look for hidden compartments.  (MVR: 14:39:00–40:25; Hr'g Tr. 79:6–21.) While Trooper Hope did this, Trooper Long remembered to get certain truck information necessary for the Level III Inspection, like its VIN number and gross vehicle weight rating, as well as Defendants' phone numbers.  (Hr'g Tr. 46:10–47:1.)  A driver's phone number is not required for a Level III Inspection, but Trooper Long generally collects them since the inspection report form includes a section for them.  (Hr'g Tr. 47:1–4.)[4]

Troopers Long and Hope both returned to their police cruiser around 2:40 p.m.  Trooper Hope asked Trooper Long to clarify what was "not normal."  (MVR

---

[4] The Government submitted a printed copy of Trooper Long's completed inspection report. (Gov. Ex. 5.)  This printed copy does not include Defendants' phone numbers.  Trooper Long testified that even though this printed copy includes no phone numbers, the program he uses to create the reports includes a space to enter phone numbers.  (Hr'g Tr. 47:2–13.)

14:40:38–41.)  Trooper Long responded, "owner/operator be [sic] a team driver."

(MVR 14:40:41–44.)  Trooper Long provided no other explanation.

Trooper Long then started cross-referencing Defendants' documents against

the Level III Inspection databases he typically uses—*i.e.*, CLEAN, NCIC, the

FMCSA portal, etc.  (Hr'g Tr. 47:16–48:6.)  However, he also ran Defendants'

numbers through a database maintained by the U.S. Drug Enforcement Agency

("DEA") called the DEA Internet Connectivity Endeavor ("DICE").  (Hr'g Tr.

82:7–12.)  DICE allows law enforcement officers to determine if a phone number

is associated with any ongoing drug trafficking investigations.  (Hr'g Tr. 49:5–7.)

The database provides the searching official a case number, agent name, and gives

a date the phone number became associated with the case.  (Hr'g Tr. 49:8–11.)

Running phone numbers through DICE is not part of a Level III Inspection.  (Hr'g

Tr. 85:1–6.)

It is unclear the order in which Trooper Long utilized these databases.  It is

clear, however, that by 2:44 p.m., Trooper Long had begun to enter Defendants'

numbers into DICE.  At that time, Trooper Hope asked Trooper Long to explain

the difference between DICE and another database.  (MVR 14:44:38–48.)  Several

seconds later, Trooper Hope asked Trooper Long which of Defendants' phone

numbers came back with a hit, presumably from DICE.  (MVR 14:45:00–03.)

Trooper Long responded that it was "driver['s]," *i.e.*, Mateo's.  (MVR 14:45:03–

05.)  Mateo's number was associated with a case run by an agent that Trooper

Long knew, so he attempted to get in contact with the agent, even though it is not

his typical practice to do so when running phone numbers through DICE.  (Hr'g

Tr. 49:12–15.)  The agent eventually called Trooper Long around 2:49 p.m.  (MVR

14:49:33.)  This call lasted for at most about six-and-a-half minutes.  (*See* MVR

14:49:38–56:08.)[5]  The agent had no additional information to provide other than

to explain that Mateo had once contacted a target of the agent's investigation.

(Hr'g Tr. 49:18–21.)

Trooper Long then spent several minutes analyzing Defendants' logbooks.

By 3:06 p.m., Trooper Long determined that the logbooks were false.  (MVR

15:05:50–06:04.)  Specifically, Mateo's status was set to "sleeper berth," even

though he was driving, and Duclos's was set to "driving," even though he was the

passenger.  (Hr'g Tr. 52:16–18, 23–25.)[6]  This logbook violation was sufficient to

put Mateo and Duclos out of service for 10 hours.  (Hr'g Tr. 50:19–23.)

Nevertheless, a Level III Inspection requires the inspector to review a driver's

---

[5] During the call, Trooper Long turned off his MVR microphone for security purposes.  (Hr'g Tr. 49:17–18.)  His microphone was off for about six-and-a-half minutes.  Trooper Long could not recall how long the phone call lasted during this time.  (Hr'g Tr. 86:15–19.)

[6] There are four statuses: (1) driving; (2) on-duty; (3) sleeper berth; and (4) off-duty.  (Hr'g Tr. 39:6–8.)  The driving status indicates one is actively driving.  (Hr'g Tr. 39:9–10.)  The on-duty status indicates one is not driving but also not free to leave a truck.  (Hr'g Tr. 39:10–11.)  The "sleeper berth" status indicates one is in a truck's sleeper berth.  (Hr'g Tr. 39:14–15.)  The off-duty status indicates one is free to leave a truck.  (Hr'g Tr. 39:15.)

current-day log and the seven preceding it.  (Hr'g Tr. 53:8–10.)  Trooper Long

therefore did so, cross-referencing the logbooks to each other and to the shipping

documentation.  (Hr'g Tr. 55:16–18.)   This required Trooper Long to resolve

certain inconsistencies.  (Hr'g Tr. 56:18–22.)  One such inconsistency existed

between the date on the aluminum's shipping documentation and those on the

Defendants' logbooks, which is an inconsistency that Trooper Long commonly

sees during Level III Inspections.  (Hr'g Tr. 56:18–22.)  Another was the fact that

Duclos's logbook showed he had been in California before traveling to Oklahoma,

but Mateo's logbook never showed him in California.  (Hr'g Tr. 57:13–14.)

Around 3:20 p.m., Trooper Long reapproached Duclos and Mateo to ask

clarifying questions about the pair's trip.  (MVR 15:20:38–45.)  Defendants

explained that, notwithstanding what the shipping documentation stated, they had

picked up the load the previous day.  (MVR 15:20:45– 50.)  Trooper Long also

learned that Mateo had flown into California from Florida to take over as Duclos's

co-driver from Duclos's wife, who had gotten sick and flew home to Florida.

(MVR 15:21:56–22:30.)  Trooper Long asked Duclos to send his wife's logbooks

for review.  (Hr'g Tr. 58:4–5.)  Trooper Long then asked what Defendants had

transported from California to Oklahoma.  (MVR 15:23:00–07.)  Defendants

responded that they did not transport anything to Oklahoma, because they could

not get a load in California.  (MVR 15:23:07–22.)  The pair had turned down a

load destined for Washington State, because Duclos did not want to drive in the snow. (Hr'g Tr. 59:6–8.) Trooper Long also learned that Defendants were to be paid $1,700 for their current aluminum load. (MVR 15:25:47–26:05.)

At 3:27 p.m., Trooper Long returned to his car after this second encounter. (MVR 15:27:07–12.) Trooper Long then called a Trooper Penrose in order to get assistance reviewing Defendants' logbooks on eRODs. (Hr'g Tr. 62:15–20; MVR 15:28:27–45.) The two troopers then spent about 16 minutes reviewing Defendants' logbooks against each other to ensure consistency. By about 3:44 p.m., Trooper Penrose conclude that Trooper Long could put Defendants out of service for having false logbooks. (MVR 15:44:14–21.) Trooper Long agreed. (MVR 15:44:22–24.) At this point, 3:44 p.m., the Level III Inspection could have ended. This is clear from the fact that the troopers' subsequent actions did not fall within the purview of a Level III Inspection.

Although Trooper Long concluded that Defendants' logbooks were "pretty consistent" in documenting the pair's trip from Oklahoma to Pennsylvania, he decided that he needed to "figure out why they drove from California to Oklahoma empty," *i.e.*, without a load. (MVR 15:44:22–33.) Troopers Long and Penrose proceeded to analyze the financial implications of Defendants' business decisions. Specifically, Trooper Penrose speculated that the pair had spent $900 on gas traveling from California to Oklahoma, based on the total miles of the trip and his

assumptions as to the truck's fuel efficiency and average gas prices.  (MVR 15:47:07–35.)  Trooper Long, in turn, deduced from Trooper Penrose's calculation that Defendants could not have been making a profit on their current trip.  (MVR 15:47:37–46.)  Around 3:48 p.m., Trooper Long's MVR microphone deactivates and remains off for the next 11 minutes.  (MVR 15:48:12–59:27.)  It is unknown what Trooper Long discussed with either Troopers Penrose or Hope during this time.

At 4:00 p.m., Duclos came back to the troopers' police cruiser.  (MVR 16:00:25–54.)  Trooper Long explained to Duclos that both his and Mateo's logbooks were false and, therefore, both of them would be out of service for 10 hours.  (Hr'g Tr. 63:3–4.)  Trooper Long then asked who paid for Mateo's plane ticket from Florida to California.  (MVR 16:01:56–59.)  Duclos responded that Mateo purchased the ticket with the expectation of reimbursement.  (MVR 16:02:00–07.)  Trooper Long then questioned Mateo as to the economic sense of driving to Oklahoma without a load.  (MVR 16:02:08–58.)  Duclos attempted to explain the business rationale for traveling to Oklahoma to pick up a load rather than stay in California where he purportedly could not get any loads.  (MVR 16:03:19–05:09.)  Trooper Long then asked Duclos a series of background questions: how long he had known Mateo, when Mateo planned to go home, and

how much Duclos planned to pay Mateo.  (MVR 16:05:10–06:46.)  This conversation lasted approximately six minutes.

Around 4:06 p.m., Trooper Long asked Duclos if there was anything illegal in the truck or if anyone gave the pair anything illegal.  (MVR 16:06:57–07:36.) Duclos denied any wrongdoing.  Trooper Long then told Duclos that they would like to search the truck and asked for his consent.  (MVR 16:07:36–39.)  Duclos refused.  (MVR 16:07:40–42.)  Trooper Long subsequently explained that he would call a canine unit and discussed next steps once the canine completed its sniff inspection.  (MVR 16:08:14–26.)

The canine unit arrived between 4:34 and 4:37 p.m.  The canine and its handler then performed a sniff inspection for approximately the next 3 minutes. (16:40:00–43:10.)  Once completed, the handler explained to Trooper Long that the canine twice alerted to the passenger-side door.  (MVR 16:43:20–34.)  Trooper Long immediately notified Defendants that the canine alerted and asked the handler to explain the results to them.  (MVR 16:43:53–44:07).  Trooper Long then explained to Duclos that he could either freely consent to a search of the truck or, otherwise, law enforcement would tow the truck and seek a search warrant.  (MVR 16:45:03–27.)  Despite initially refusing consent again, Duclos sought to discuss the matter with Mateo, and Trooper Long obliged.  (Hr'g Tr. 65:7–8.)

Duclos and Mateo mulled over the decision together for about 25 minutes, between about 4:48 p.m. and 5:13 p.m. At that time, Duclos stated that he would consent to the search. (MVR 17:13:23–30.) Trooper Long, therefore, presented Duclos a consent form. (Hr'g Tr. 65:12–14.) Duclos, however, decided not to give consent after reviewing the form. (Hr'g Tr. 65:14–15.) At about 5:19 p.m., Trooper Long called for a tow truck. (MVR: 17:18:58–19:20.) The tow truck eventually took the truck to PSP Chambersburg. The total time elapsed between the initiation of the stop and the truck being towed away totaled approximately four-and-a-half hours.

Trooper Long applied for and received a warrant to search the truck. (Gov. Ex. 1.) In the truck, law enforcement found 22 individually wrapped kilogram packages of cocaine and three loaded firearms. (*Id.*)

## PROCEDURAL HISTORY

On April 3, 2024, a federal grand jury indicted Mateo and Duclos on the following charges: (1) conspiracy to possess with intent to distribute five kilograms and more of cocaine in violation of 21 U.S.C. § 846; (2) possession with intent to distribute five kilograms and more of cocaine in violation of 21 U.S.C. § 841(a)(1); and (3) possession of firearms in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c). (Doc. 1.) Defendants each pleaded not guilty to the crimes charged. (Docs. 12 & 13.)

On December 9, 2024, Defendants filed a joint motion to suppress evidence along with a brief in support.  (Docs. 42 & 43.)  The Government responded with a brief in opposition.  (Doc. 48.)  On April 11, 2025, the court convened an evidentiary hearing on the joint motion.  The court then permitted Defendants and the Government to file supplemental briefing.  (Doc. 56.)  In turn, Defendants filed a post-hearing brief in support, and the Government filed a post-hearing brief in opposition.  (Docs. 60 & 63.)  Defendants' joint motion is now ripe for review.

## DISCUSSION

The Fourth Amendment guarantees, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  The Supreme Court recognized in *Terry v. Ohio*, 392 U.S. 1 (1968), that "certain seizures are justifiable under the Fourth Amendment if there is articulable suspicion that a person has committed or is about to commit a crime."  *Florida v. Royer*, 460 U.S. 491, 498 (1983).  This was the first recognized exception to the general rule that "seizures of the person require probable cause to arrest."  *Id.* at 499.  Vehicle traffic stops fall within *Terry's* purview.  *United States v. Green*, 897 F.3d 173, 178 (3d Cir. 2018).  Accordingly, law enforcement may initiate a traffic stop so long as they have "reasonable suspicion that a traffic violation has occurred."  *Id.*  These stops, however, may not last indefinitely.  Indeed, "[a] *Terry* stop was never intended to

authorize a lengthy detention to complete an investigation that is prompted by"

reasonable suspicion.  *United States v. Leal*, 235 F. App'x 937, 940 (3d Cir. 2007).

From this basic principle, Defendants present two alternative Fourth

Amendment violations that they argue warrant suppression of the evidence

obtained from Trooper Long's traffic stop and subsequent search.  First,

Defendants argue that Trooper Long without reasonable suspicion wrongfully

prolonged the stop beyond the time necessary to complete its mission.  (Doc. 60,

pp. 6–13.)  Alternatively, Defendants contend that, even with reasonable suspicion,

Trooper Long prolonged the stop so long that it became a *de facto* arrest

unsupported by probable cause.  (*Id.* at 13–18.)  Based on the court's analysis,

Defendants do not prevail on either argument.

## A. *Rodriguez*

The mission of a traffic stop—"to address the traffic violation that warranted

the stop, and attend to related safety concerns"—is what defines "the tolerable

duration of police inquiries" during such a stop.  *Rodriguez*, 575 U.S. at 354

(internal citation omitted).  In other words, the stop "may 'last no longer than is

necessary to effectuate" its mission.  *Id.* (quoting *Royer*, 460 U.S. at 500); *accord*

*Illinois v. Caballes*, 543 U.S. 405, 407 (2005) ("A seizure that is justified solely by

the interest in issuing a warning ticket to the driver can become unlawful if it is

prolonged beyond the time reasonably required to complete that mission.").

Police effectuating a traffic stop may conduct "certain unrelated investigations"—*i.e.*, "measures aimed at detecting criminal activity more generally" *Green*, 897 F.3d at 179—so long as they "d[o] not lengthen the roadside detention." *Rodriguez*, 575 U.S. at 354.  Nevertheless, *Rodriguez* made clear that unrelated investigations that cause even a *de minimis* prolongment of a traffic stop is not tolerated under the Fourth Amendment, absent reasonable suspicion.  *Id.* at 357.  Accordingly, a traffic stop is impermissibly extended "when an officer, without reasonable suspicion, diverts from a stop's traffic-based purpose to investigate other crimes."  *Green*, 897 F.3d at 179; *accord United States v. Hurtt*, 31 F.4th 152, 159 (3d Cir. 2022).

Recognizing these principles, the court analyzes Defendants' first argument in two steps.  *Hurtt*, 31 F.4th at 159.  The court first considers if and when Trooper Long measurably extended the traffic stop to investigate other crime.  *Id.*  The point at which this occurs is known as the "*Rodriguez* moment."  *Id.*  If a *Rodriguez* moment occurred, the court considers whether the facts available to Trooper Long at the time of the *Rodriguez* moment "were sufficient to establish reasonable suspicion."  *Id.* (quoting *Green*, 897 F.3d at 179).

### 1.  The *Rodriguez* Moment

Defendants argue that the *Rodriguez* moment occurred when Trooper Long told Trooper Hope, "that's not normal," after finishing his initial questioning of

16

Defendants.  (Doc. 60, p. 9.)  The Government counters that the *Rodriguez* moment occurred no earlier than when Trooper Long entered Defendants' phone numbers into DICE.  (Doc. 63, pp. 4–5.)

Although many cases present challenges for pinpointing the *Rodriguez* moment, this need not be one of those cases.  It is immaterial which of the two proposed moments is deemed the *Rodriguez* moment, because the Government does not proffer or rely on any facts that Trooper Long learned in the six minutes between the two moments to support its contention that Trooper Long had reasonable suspicion to pursue the investigative steps he took.  (*See* Doc. 63, p. 5.)  Therefore, the court finds it prudent to assume, without deciding, that the *Rodriguez* moment occurred when Trooper Long told Trooper Hope, "that's not normal."[7]  *See Green*, 897 F.3d at 182; *United States v. Trusty*, Crim. No. 20-543, 2024 WL 1827645, at *11 n.11 (D.N.J. Apr. 26, 2024); *United States v. Eddings*, Crim. No. 21-117, 2023 WL 1775705, at *9 (W.D. Pa. Feb. 6, 2023); *United States v. Wilburn*, No. 2:18-CR-115, 2021 WL 1310423, at *27 (W.D. Pa. Apr. 8, 2021).

### 2.  Reasonable Suspicion

The court now must determine if Trooper Long had reasonable suspicion to prolong the stop, given what he knew at the conclusion of his initial encounter with

---

[7] It is worth emphasizing, however, that the court's analytical methodology should not be construed as support for the proposition that a single observation made by one officer to another in the course of a traffic stop is sufficient to trigger a *Rodriguez* moment.  Defendants cite no authority supporting such a conclusion.  And, the court makes no such legal conclusion here.

Mateo and Duclos.  Reasonable suspicion requires "considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause."  *Navarette v. California*, 572 U.S. 393, 397 (2014) (internal quotation marks omitted).  But, an "inchoate and unparticularized suspicion or 'hunch'" does not create reasonable suspicion.  *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 27).  The officer must have "'a particularized and objective basis' for suspecting" criminal activity is afoot.  *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)).  This is not a high bar to clear, as "an officer needs only 'a minimal level of objective justification.'"  *United States v. Foster*, 891 F.3d 93, 104 (3d Cir. 2018) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).  Given the "less demanding" nature of this standard, "reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause."  *Kansas v. Glover*, 589 U.S. 376, 380 (2020) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)).

The court must evaluate reasonable suspicion "under the totality of the circumstances."  *Green*, 897 F.3d at 183.  It will not ponder plausible innocent explanations for each suspicious fact in isolation, so long as the facts together "serve to eliminate a substantial portion of innocent travelers."  *United States v. Thompson*, 772 F.3d 752, 758 (3d Cir. 2014) (quoting *United States v. Mathurin*,

561 F.3d 170, 174 (3d Cir. 2009)); *accord Green*, 897 F.3d at 183 ("[R]easonable

suspicion cannot be defeated by a so-called 'divide-and-conquer' analysis,

whereby each arguably suspicious factor is viewed in isolation and plausible,

innocent explanations are offered for each.").

The court must also recognize that reasonable suspicion "depends on the

factual and practical considerations of everyday life on which *reasonable and*

*prudent men*, not legal technicians, act." *Glover*, 589 U.S. at 380 (emphasis in

original) (quoting *Navarette*, 572 U.S. at 402). Accordingly, courts "afford

significant deference to a law enforcement officer's determination of reasonable

suspicion." *Foster*, 891 F.3d at 104. Police officers must be permitted, "based on

training and experience, to make inferences from and deductions about the

cumulative information available to them that might well elude an untrained

person." *Green*, 897 F.3d at 183 (internal quotation marks omitted); *accord*

*Glover*, 589 U.S. at 380–81 (admonishing that courts "must permit officers to

make 'commonsense judgments and inferences about human behavior.'"); *Foster*,

891 F.3d at 104 ("[A] trained officer may find reasonable suspicion 'based on acts

capable of innocent explanation.'").

At the time Trooper Long's initial encounter with Defendants ended, he

knew that: (1) Defendants' truck had a confirmed window-tint violation; (2) Mateo

was exhibiting signs of nervousness when answering questions, including heavy

breathing and staring ahead between answers; (3) Mateo was answering questions

about the window-tint violation, even though Duclos, the truck owner, was present;

(4) Defendants were carrying a light load from Oklahoma to New York; (5) an

owner-operator was team driving; (6) both drivers were upfront, rather than one of

them being asleep; (7) Defendants were traveling on the Pennsylvania Turnpike,

whereas Trooper Long ordinarily sees trucks coming from Oklahoma use Interstate

81; and (8) the Pennsylvania Turnpike is an interstate that annually sees some of

the most drug seizures in Pennsylvania, Hr'g Tr. 43:19–25.

Defendants claim—without citation to any authority—that Trooper Long's

observations are "merely the kind of generalized impressions that courts have

consistently rejected." (Doc. 60, p. 12.) The court disagrees. Many facts similar

to those specified here have contributed to findings of reasonable suspicion. *See,*

*e.g.*, *Wardlow*, 528 U.S. at 124 ("[N]ervous, evasive behavior is a pertinent factor

in determining reasonable suspicion."); *United States v. Stewart*, 92 F.4th 461, 470

(3d Cir. 2024) (defendant traveling on interstate known to be a drug trafficking

corridor); *United States v. Garner*, 961 F.3d 264, 272 (3d Cir. 2020) (defendant

traveling on interstate known to be a drug trafficking corridor); *United States v.*

*Lopez*, 304 F. App'x 82, 84 (3d Cir. 2008) (commercial truck's passenger being

awake, instead of asleep, during time-sensitive load); *Cf. United States v.*

*Fraguela-Casanova*, 858 F. Supp. 2d 432, 436, 440–41 (M.D. Pa. 2012) (crediting

officer's explanation that Defendants' use of Pennsylvania Turnpike, rather than Interstate 81, while traveling from Kentucky to New York was suspicious because it avoided truck checkpoints).

In light of Trooper Long's training and experience, the court does not conclude that he was acting on a mere hunch. Rather, Trooper Long provided sufficient objective justification for suspecting Defendants were engaging in unlawful activity. Therefore, the court finds that Trooper Long did not violate Defendants' Fourth Amendment rights when he extended the traffic stop to investigate potential criminal activity. Having made this determination, the court must now determine whether Trooper Long prolonged the stop such that he effectuated a *de facto* arrest without probable cause.

### B. *De Facto* Arrest

"The line between a proper *Terry* stop and an improper *de facto* arrest is elusive and not easily drawn." *Leal*, 235 F. App'x at 940. Indeed, there is "no rigid time limitation on *Terry* stops." *United States v. Sharpe*, 470 U.S. 675, 685 (1985). The proper analysis, instead, "examine[s] whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Id.* at 686; *accord United States v. Carter*, No. 22-3395, 2024 WL 195475, at *3 (3d Cir. Jan. 18, 2024) (explaining that the touchstone of the analysis "is whether

the defendant was detained longer than necessary for the police to conduct their investigation"). Factors the court must consider are "(1) the duration of the stop; (2) the purposes justifying the investigatory detention; (3) whether the police acted diligently to confirm or dispel their suspicions; and (4) any reasonable alternatives the police could have employed to serve their purposes." *Fraguela-Casanova*, 858 F. Supp. 2d at 442 (citing *Sharpe*, 470 U.S. at 684–87, and *Leal*, 235 F. App'x at 941). In doing so, the court will "not indulge in unrealistic second-guessing." *Sharpe*, 470 U.S. at 686.

### 1. Probable Cause to Arrest

Defendants argue that their four-and-a-half-hour roadside detention constituted a *de facto* arrest without probable cause. (Doc. 60, p. 13.) Yet, a threshold defect in Defendants' argument is immediately apparent. Defendants assume that Trooper Long did not have probable cause to arrest them for the entire four-and-a-half hours that they were detained roadside. That assumption is misplaced.

An officer has probable cause to arrest "when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 467 (3d Cir. 2016) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 483 (3d Cir. 1995)). Like

reasonable suspicion, courts must consider the totality of the circumstances in determining whether probable cause to arrest exists. *Id.* at 467–68.

Here, the court finds that Trooper Long had probable cause to arrest Mateo and Duclos when the canine alerted to narcotics in the truck. At that time, Trooper Long had come to learn—in addition to the information already gathered in his first encounter with Defendants—that Mateo's phone number had been in contact with the target of a DEA investigation and that Duclos assumed the additional costs of paying Mateo and reimbursing him for his flight to California all to transport nothing from California to Oklahoma and a small load worth relatively little from Oklahoma to New York. Moreover, Duclos admitted that he had a marijuana pen in the truck immediately following the positive canine alert. (MVR 16:45:57–46:03.) All of the facts known to Trooper Long together with the canine alert established probable cause to arrest Defendants. *Cf. Royer*, 460 U.S. at 506 (explaining that a positive canine alert "would have resulted in [the defendant's] justifiable arrest on probable cause"); *United States v. Benoit*, 730 F.3d 280, 287 (3d Cir. 2013) (finding that, in the context of a sea vessel, "once the canine alerted to the presence of narcotics on the vessel, probable cause existed to arrest" the defendant); *United States v. Massac*, 867 F.2d 174, 176 (3d Cir. 1989) ("When the alert was given by the dog, we are satisfied that, at least when combined with the other known circumstances, probable cause existed to arrest.")

The upshot of this determination is that the court's analysis must focus on whether an unconstitutional *de facto* arrest occurred during the approximately 133 minutes between the start of the traffic stop and when the canine alerted to the presence of narcotics in the truck—*i.e.*, the point at which Trooper Long had probable cause to arrest Defendants.  (MVR 14:30:56–16:43:34.)

### 2.  Reasonableness of Defendants' Detention

At the outset, the court recognizes that 133 minutes is a long time for an investigative stop.  If duration were the sole factor considered, the duration here would raise significant constitutional concern.  Indeed, other courts have found less time-consuming seizures impermissible.  *See, e.g.*, *United States v. Place*, 462 U.S. 696, 709–10 (1983) (finding a 90-minute seizure unreasonable on the facts of that case); *Fraguela-Casanova*, 858 F. Supp. 2d at 448 (finding 94-minute seizure constituted *de facto* arrest).  Nevertheless, the duration of a seizure is not dispositive on the present issue.  *Sharpe*, 470 U.S. at 685.  As noted above, the court must consider the duration of the stop in relation to the purpose justifying the stop, which was to conduct a Level III Inspection.

For the first 74 minutes of the stop, Trooper Long spent nearly all of his time completing the tasks required for the Level III Inspection, *i.e.*, cross-refencing the appropriate databases, reviewing logbooks for the present day and previous seven, etc.  (MVR 14:30:56–15:44:24.)  The only tasks Trooper Long conducted that

24

were unnecessary for a Level III Inspection during these 74 minutes were running

Defendants' phone numbers through DICE and speaking with the agent involved in

the case with which Mateo's number was associated.  Notwithstanding this

marginal detour, Trooper Long's actions do not reveal a lack of diligence in this

first 74 minutes.  Indeed, it had taken Trooper Long 55 minutes on average to

conduct a Level III Inspection in his 161 preceding inspections.  (Gov. Ex. 7.)

And, the present Level III Inspection was more difficult than a typical one since it

involved reviewing multiple drivers' logbooks.  (Hr'g Tr. 53:1–10.)[8]  So, too,

Trooper Long was at least implicitly responsible for providing on-the-job training

to Trooper Hope.  (*See* Hr'g Tr. 24:16–19).  The court cannot say on these facts

that Trooper Long crossed any constitutional lines in taking 74 minutes to

complete the tasks required for a Level III Inspection.  Therefore, the question

becomes whether Trooper Long crossed such lines by extending the stop for an

additional 59 minutes.  Upon review of relevant authorities, the court's finds that

he did not.

Defendants primarily rely on *Fraguela-Casanova*, in which another judge of

this court held that an officer's 94-minute traffic stop of commercial truck drivers

violated the drivers' Fourth Amendment rights.  858 F. Supp. 2d at 448.  In

---

[8] Despite having to compare multiple days from multiple logbooks, Trooper Long's computer could only display one day from each logbook at a time.  (Hr'g Tr. 53:6–10.)

*Fraguela-Casanova*, law enforcement pulled over a commercial truck for improperly changing lanes without its turn signal. *Id.* at 435–36. During the stop, the officer collected and reviewed various documents such as medical cards, commercial driver's licenses, and one of the driver's logbooks. *Id.* at 436. The officer then prepared a warning for the improper lane change as well as one for the co-driver missing his logbooks. *Id.* The officer had completed the traffic-based mission of the stop within the first 30 minutes. *Id.* at 443. The officer spent the next 56 minutes running various searches on the drivers' criminal histories and potential outstanding warrants on them. *Id.* at 444. During these checks, the officer spent an extended amount of time determining whether officials in Florida might want to revoke one of the driver's parole and waited for his partner to run "an exhaustive state-by-state search" of the drivers' criminal histories. *Id.* at 445. The court found that this information was "unrelated to . . . verifying or dispelling whether [the defendants] were transporting illegal materials" and described it as a "fishing expedition." *Id.* at 445–46. It was not until after this 56-minute fishing expedition that the officer asked for consent to search the car. *Id.* at 446. The court determined such a delay was impermissible.

The facts of this case do not pose the same type of meaningless delay as involved in *Fraguela-Casanova*. Like the officer in *Fraguela-Casanova*, Trooper Long spent some time on matters that did not concretely move his investigation

26

along after he had completed the traffic-based mission of his stop.  Approximately

23 minutes elapsed between the time Trooper Long completed the tasks required

for the Level III Inspection and him asking Duclos for consent to search the truck.

(MVR 15:44:24–16:07:39).  It is unknown what Trooper Long did for 11 of these

minutes.  For the rest of the time, he spent at least four to five minutes speculating

about the financial sensibility of Defendants' business decisions and spent about

seven minutes asking Duclos additional questions about the financial implication

of his decisions and other background questions.  The court cannot say that this

was the most expeditious method of confirming or dispelling his suspicions.  But,

upon these facts, Trooper Long's 23-minute delay between completing the traffic-

based mission of the stop and asking for consent to search was significantly shorter

than the 56 minutes spent in *Fraguela-Casanova*.  In fact, Trooper Long's delay is

more similar in duration to delays that courts have found permissible.  *Cf. Garner*,

961 F.3d at 272 (10- to 15-minute delay between completing records check

incident to traffic stop and asking for consent to search); *United States v. Stewart*,

No. 3:18-CR-00310, 2021 WL 2478440, at *2, 15–16 (M.D. Pa. June 17, 2021)

(17-minute delay between deciding to give driver a warning for vehicle code

violation and asking for consent to search), *aff'd*, 92 F.4th 461.[9]  Based on these

_____

[9] The court recognizes that the delays in *Garner* and *Stewart* were primarily due to one officer
waiting for backup before asking for consent to search the vehicle.  *Garner*, 961 F.3d at 268;
*Stewart*, 2021 WL 2478440, at *15.  Notwithstanding the difference in justification for the

authorities, the court cannot conclude that Trooper Long's 23-minute delay

violated Defendants' Fourth Amendment rights.

After his 23-minute delay, Trooper Long asked Duclos for consent to search

the truck and called a canine unit immediately upon Duclos's refusal. The

approximately 30 minutes it then took for the canine unit to respond to the scene

and 6 minutes it took to complete the sniff investigation was not an unreasonable

delay. *See Garner*, 961 F.3d at 272 ("[W]e have observed no lack of diligence by

officers in waiting to call for K-9 units until after the suspect has denied consent.");

*Stewart*, 2021 WL 2478440, at *15 (determining that officer "called the canine unit

as soon as Defendant denied consent to search the van and, pursuant to *Garner*,

this timing cannot be deemed unreasonable"); *see also United States v. Leal*, 385

F. Supp. 2d 540, 544, 548 (W.D. Pa. 2005) (finding a 45- to 60-minute delay in

arrival of canine unit not unreasonable under the circumstances), *aff'd*, 235 F.

App'x 937.

---

delays in those cases versus the delay here, the court finds *Garner* and *Stewart* instructive in
considering what is reasonable under the circumstances of this case. The court simply
analogizes to these cases in considering what is an acceptable delay between finishing the traffic-
based mission of a stop and taking meaningful steps to verify or dispel suspicions of illegal
activity. The duration of such a delay in this case is so much closer to that of *Garner* and
*Stewart* that it would be disingenuous to find Trooper Long's delay as egregious as the one in
*Fraguela-Casanova*. Accounting for the time he spoke to Duclos right before asking for
consent to search, Trooper Long spent about 16 minutes on matters that would not quickly verify
or dispel his suspicions of drug trafficking. This is significantly different than the 56 minutes the
officer in *Fraguela-Casanova* spent on such matters.

Ultimately, the court concludes that Defendants were not subject to a *de facto* arrest without probable cause. Trooper Long's conduct on the whole does not show a lack of diligence in investigating his suspicions. Instead, he completed the tasks necessary for a Level III Inspection in a reasonable amount of time and then—following a less-than-ideal 23-minute delay—investigated his suspicions with reasonable swiftness. Although this 23-minute delay might not be a model of swift investigatory work, the court concludes that it did not render Defendants' seizure unconstitutional under the circumstances present in this case.

## CONCLUSION

For the foregoing reasons, Defendants' motion to suppress will be denied. An appropriate order will issue.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: July 29, 2025